ATARI, INC., a Delaware corporation, and Midway Mfg. Co., an Illinois corporation, Plaintiffs-Appellants,

v.

NORTH AMERICAN PHILIPS CONSUMER ELECTRONICS CORP., a Tennessee corporation, and Park Television, d/b/a Park Magnavox Home Entertainment Center, an Illinois partnership, Defendants-Appellees.

No. 81–2920.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1982.

Decided March 2, 1982.

Daniel W. Vittum, Jr., Kirkland & Ellis, Chicago, Ill., for plaintiffs-appellants.

Theodore W. Anderson, Neuman, Williams, Anderson & Olson, Chicago, Ill., for defendants-appellees.

Before WOOD and ESCHBACH, Circuit Judges, and GORDON,* District Judge.

HARLINGTON WOOD Jr., Circuit Judge.

Plaintiffs-appellants Midway Manufacturing Co. ("Midway") and Atari, Inc. ("Atari") instituted this action against defendants-appellees North American Philips Consumer Electronics Corp. ("North American") and Park Magnavox Home Entertainment Center ("Park") for copyright infringement of and unfair competition against their audiovisual game "PAC-MAN." The district court denied plaintiffs' motion for a preliminary injunction, and this appeal followed, 28 U.S.C. § 1292(a)(1).

## I. FACTS

Atari and Midway own the exclusive United States rights in PAC-MAN under the registered copyright for the "PAC-MAN audiovisual work." Midway sells the popular coin-operated arcade version, and Atari recently began to market the home video version. As part of its Odyssey line of home video games, North American developed a game called "K. C. Munchkin" which Park sells at the retail level. Plaintiffs filed this suit alleging that K. C. Munchkin infringes their copyright in PAC-MAN in violation of 17 U.S.C. §§ 106, 501 (Supp. I 1977), and that North American's conduct in marketing K. C. Munchkin constitutes unfair competition in violation

of the Illinois Uniform Deceptive Trade Practices Act, Ill.Rev.Stat. Ch. 121½, §§ 311-17 (1980), and the common law. The district court denied plaintiffs' motion for a preliminary injunction, ruling that plaintiffs failed to show likelihood of success on the merits of either claim.

Because this appeal requires us to make an ocular comparison of the two works, we describe both games in some detail.

### A. The Copyrighted Work

The copyrighted version of PAC-MAN is an electronic arcade maze-chase game. Very basically, the game "board," which appears on a television-like screen, consists of a fixed maze, a central character (expressed as a "gobbler"), four pursuit characters (expressed as "ghost monsters"), several hundred evenly spaced pink dots which line the pathways of the maze, four enlarged pink dots ("power capsules") approximately located in each of the maze's four corners, and various colored fruit symbols which appear near the middle of the maze during the play of the game.

Using a "joy stick," the player guides the gobbler through the maze, consuming pink dots along the way. The monsters, which roam independently within the maze, chase the gobbler. Each play ends when a monster catches the gobbler, and after three plays, the game is over. If the gobbler consumes a power capsule, the roles reverse temporarily: the gobbler turns into the hunter, and the monsters become vulnerable. The object of the game is to score as many points as possible by gobbling dots, power capsules, fruit symbols, and monsters.

The PAC-MAN maze has a slightly vertical rectangular shape, and its geometric configuration is drawn in bright blue double lines. Centrally located on the left and right sides of the maze is a tunnel opening. To evade capture by a pursuing monster, the player can cause the central character to exit through one opening and re-enter through the other on the opposite side. In

---

* The Honorable Myron L. Gordon, District Judge of the United States District Court for the Eastern District of Wisconsin, is sitting by designation.

video game parlance this concept is called a "wraparound." In the middle is a rectangular box ("corral") which has a small opening on the upper side. A scoring table, located across the top of the maze, displays in white the first player's score on the left, the high score to date in the middle, and the second player's score on the right. If a player successfully consumes all of the dots, the entire maze flashes alternately blue and white in victory, and a new maze, replenished with dots, appears on the screen. When the game ends a bright red "game over" sign appears below the corral.

At the start of the game, the gobbler character is located centrally near the bottom of the maze. That figure is expressed as a simple yellow dot, somewhat larger than the power capsules, with a V-shaped aperture which opens and closes in mechanical fashion like a mouth as it travels the maze. Distinctive "gobbling" noises accompany this action. If fate (or a slight miscalculation) causes the gobbler to fall prey to one of the monsters, the action freezes, and the gobbler is deflated, folding back on itself, making a sympathetic whining sound, and disappearing with a star-burst.

The four monster characters are identical except that one is red, one blue, one turquoise, and one orange. They are about equal in size to the gobbler, but are shaped like bell jars. The bottom of each figure is contoured to stimulate three short appendages which move as the monster travels about the maze. Their most distinctive feature is their highly animated eyes, which appear as large white circles with blue irises and which "look" in the direction the monster is moving. At the start of each play, the monsters are located side-by-side in the corral, bouncing back and forth until each leaves through the opening. Unlike the gobbler, they do not consume the dots, but move in a prearranged pattern about the maze at a speed approximately equal to that of the gobbler. When the gobbler consumes a power capsule and the roles reverse, the monsters panic: a siren-like

alarm sounds, they turn blue, their eyes contract into small pink dots, a wrinkled "mouth" appears, and they immediately reverse direction (moving at a reduced speed). When this period of vulnerability is about to end, the monsters warn the player by flashing alternately blue and white before returning to their original colors. But if a monster is caught during this time, its body disappears, and its original eyes reappear and race back to the corral. Once in the corral, the monster quickly regenerates and reenters the maze to resume its pursuit of the gobbler.

Throughout the play of PAC–MAN, a variety of distinctive musical sounds comprise the audio component of the game. Those sounds coincide with the various character movements and events occurring during the game and add to the excitement of the play.

### B. The Accused Work

North American's K. C. Munchkin is also a maze-chase game that employs a player-controlled central character (also expressed as a "gobbler"), pursuit characters (also expressed as "ghost monsters"), dots, and power capsules. The basic play of K. C. Munchkin parallels that of PAC–MAN: the player directs the gobbler through the maze consuming dots and avoiding capture by the monsters; by gobbling a power capsule, the player can reverse the roles; and the ultimate goal is to accumulate the most points by gobbling dots and monsters.

K. C. Munchkin's maze also is rectangular, has two tunnel exits and a centrally located corral, and flashes different colors after the gobbler consumes all of the dots. But the maze, drawn in single, subdued purple lines, is more simple in overall appearance. Because it appears on a home television screen, the maze looks broader than it is tall. Unlike that in PAC–MAN, the maze has one dead-end passageway, which adds an element of risk and strategy.[1] The corral is square rather than rec-

---

1. The K. C. Munchkin home video game has several modes with an almost indefinite variety

of mazes. One mode, for example, employs a constantly changing configuration, in another,

tangular and rotates ninety degrees every two or three seconds, but serves the same purpose as the corral in PAC–MAN. The scoring table is located below the maze and, as in PAC–MAN, has places on the left and right for scores for two players.[2] But instead of simply registering the high score in the middle, the K. C. Munchkin game displays in flashing pink and orange a row of question marks where the high scorer can register his or her name.

The gobbler in K. C. Munchkin initially faces the viewer and appears as a round blue-green figure with horns and eyes. The gobbler normally has an impish smile, but when a monster attacks it, its smile appropriately turns to a frown. As it moves about the maze, the gobbler shows a somewhat diamond-shaped profile with a V-shaped mouth which rapidly opens and closes in a manner similar to PAC–MAN's gobbler. A distinctive "gobbling" noise also accompanies this movement. When the gobbler stops, it turns around to face the viewer with another grin. If captured by a monster, the gobbler also folds back and disappears in a star-burst. At the start of each play, this character is located immediately above the corral. If successful in consuming the last dot, the munchkin turns to the viewer and chuckles.[3]

K. C. Munchkin's three ghost monsters appear similar in shape and movement to their PAC–MAN counterparts.[4] They have round bodies (approximately equal in size to the gobbler) with two short horns or antennae, eyes, and three appendages on the bottom. The eyes are not as detailed as those of the PAC–MAN monsters, but they are uniquely similar in that they also "look" in the direction in which the monster is moving. Although slightly longer, the "legs"

also move in a centipede-like manner as the monster roams about the maze. The similarity becomes even more pronounced when the monsters move vertically because their antennae disappear and their bodies assume the more bell jar-like shape of the PAC–MAN monsters. Moreover, the monsters are initially stationed inside the corral (albeit in a piggyback rather than a side-by-side arrangement) and exit into the maze as soon as play commences.

K. C. Munchkin's expression of the role reversal also parallels that in PAC–MAN. When the gobbler consumes one of the power capsules, the vulnerable monsters turn purple and reverse direction, moving at a slightly slower speed. If caught by the gobbler, a monster "vanishes": its body disappears and only white "eyes" and "feet" remain to indicate its presence. Instead of returning directly to the corral to regenerate, the ghost-like figure continues to wander about the maze, but does not affect the play.[5] Only if the rotating corral happens to open up toward the monster as it travels one of the adjacent passageways will the monster re-enter the corral to be regenerated. This delay in regeneration allows the gobbler more time to clear the maze of dots. When the period of vulnerability is about to end, each monster flashes its original color as a warning.

There are only twelve dots in K. C. Munchkin as opposed to over two hundred dots in PAC–MAN. Eight of those dots are white; the other four are power capsules, distinguished by their constantly changing color and the manner in which they blink. In K. C. Munchkin, the dots are randomly spaced, whereas in PAC–MAN, the dots are uniformly spaced. Furthermore, in K. C.

the player can build his or her own maze, and in yet another, the maze disappears when the gobbler moves.

2. Before any player registers points, the PAC–MAN scoring table displays in white "1 UP" and "2 UP" where the scores will appear. The K. C. Munchkin game simply displays "0000" in orange for the first player and in white for the second.

3. The district court stated that "the central character is made to have a personality which the central character in 'PAC–MAN' does not have."

4. The district court, however, characterized the K. C. Munchkin monsters as much "spookier."

5. During this time, the white eyes disappear and reappear in alternating sequence with the reappearance and disappearance of the monster's body silhouetted in white.

Munchkin, the dots are rectangular and are always moving. As the gobbler munches more dots, the speed of the remaining dots progressively increases, and the last dot moves at the same speed as the gobbler. In the words of the district court, "the last dot . . . cannot be caught by overtaking it; it must be munched by strategy." At least initially, one power capsule is located in each of the maze's four corners, as in PAC–MAN.

Finally, K. C. Munchkin has a set of sounds accompanying it which are distinctive to the whole line of Odyssey home video games. Many of these sounds are dissimilar to the sounds which are played in the arcade form of PAC–MAN.

### C. The Creation and Promotion of the Accused Work

Ed Averett, an independent contractor, created K. C. Munchkin for North American. He had previously developed approximately twenty-one video games, including other maze-chase games. He and Mr. Staup, who is in charge of North American's home video game development, first viewed PAC–MAN in an airport arcade. Later, after discussing the strengths and weaknesses of the PAC–MAN game and its increasing popularity, they decided to commence development of a modified version to add to North American's Odyssey line of home video games. Mr. Averett also played PAC–MAN at least once before beginning work on K. C. Munchkin.

Mr. Staup and Mr. Averett agreed, however, that the PAC–MAN game, as is, could become popular as a home video game, but only if marketed under the "PAC–MAN" name. Thus, as Mr. Averett worked on K. C. Munchkin, North American sought to obtain from Midway a license under the PAC–MAN copyright and trademark. Mr. Staup later learned that the license was not available and so informed Mr. Averett. At that time, Mr. Averett had not yet completed K. C. Munchkin.

When Mr. Averett finished the project, North American examined the game and concluded that it was "totally different"

from PAC–MAN. To avoid any potential claim of confusion, however, Mr. Averett was told to make further changes in the game characters. As a result, the color of the gobbler was changed from yellow to its present bluish color. North American also adopted the dissimilar name "K. C. Munchkin" and issued internal instructions not to refer to PAC–MAN in promoting K. C. Munchkin.

An independent retailer in the Chicago area nonetheless ran advertisements in the *Chicago Sun-Times* and the *Chicago Tribune*, describing K. C. Munchkin as "a Pac-Man type game" and "as challenging as Pac-Man." Another printed advertisement referred to K. C. Munchkin as "a PAC–MAN game." Plaintiffs also sent investigators to various stores to purchase a K. C. Munchkin game. In response to specific inquiries, sales persons in two stores, one being the aforementioned independent retailer, described the Odyssey game as "like PAC–MAN" and as "Odyssey's PAC–MAN."

## II. STANDARD OF REVIEW AND PRELIMINARY INJUNCTIONS

This court will not reverse the grant or denial of a preliminary injunction absent "a showing from the totality of the factors that a clear abuse of the trial court's discretion has occurred or that the court's findings were clearly erroneous or represent a certain mistake of law." *Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164, 166 (7th Cir. 1981). Four factors enter into the district court's exercise of discretion to grant or deny a preliminary injunction: (1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; (3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and (4) whether the granting of a preliminary injunction will disserve the public interest. *Reinders Brothers v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 48 (7th Cir. 1980).

The district court concluded only that plaintiffs failed to meet the threshold requirement of showing likelihood of success on the merits. The court thus did not address the other factors in denying plaintiffs' motion. *See Kolz v. Board of Education of City of Chicago*, 576 F.2d 747, 749 (7th Cir. 1978). Upon reversing that decision, this court nonetheless may direct that a preliminary injunction be entered if we find from the record that plaintiffs as a matter of law made the requisite showing as to the remaining elements.

■ Under the circumstances of this case, the determination of copyright infringement (or lack thereof) is predicated upon an ocular comparison of the works themselves and does not involve any material credibility issues. Therefore, this court is in as good a position as the district court to decide that question. *See Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 (2d Cir. 1977); *cf. Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 383 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) (trademark infringement).

### III. COPYRIGHT INFRINGEMENT

■ To establish infringement a plaintiff must prove ownership of a valid copyright and "copying" by the defendant. *See* 3 M. Nimmer, Nimmer On Copyright § 13.-01, at 13–3 (1981) ("Nimmer"). Because direct evidence of copying often is unavailable, copying may be inferred where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work. *Warner Brothers, Inc. v. American Broadcasting Cos., Inc.*, 654 F.2d 204, 207 (2d Cir. 1981). The parties stipulated to the validity of plaintiffs' copyright and to access; the district court's ruling turned solely on the question of substantial similarity.

■ Some courts have expressed the test of substantial similarity in two parts: (1) whether the defendant copied from the plaintiff's work and (2) whether the copying, if proven, went so far as to constitute an improper appropriation. *See Scott v. WKJG, Inc.*, 376 F.2d 467, 469 (7th Cir.), *cert. denied*, 389 U.S. 832, 88 S.Ct. 101, 19 L.Ed.2d 91 (1967); *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *cf. Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977) (extrinsic-intrinsic test). Our analysis focuses on the second part of that test and the response of the "ordinary observer." *See Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.)*, 360 F.2d 1021, 1023 n.2 (2d Cir. 1966). Specifically, the test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value. *Krofft*, 562 F.2d at 1164. Judge Learned Hand, in finding infringement, once stated that "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960). It has been said that this test does not involve "analytic dissection and expert testimony," *Arnstein*, 154 F.2d at 468, but depends on whether the accused work has captured the "total concept and feel" of the copyrighted work, *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970).

■ While dissection is generally disfavored, the ordinary observer test, in application, must take into account that the copyright laws preclude appropriation of only those elements of the work that are protected by the copyright.[6] *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980); *Clarke v. G. A. Kayser &*

---

**6.** "When the alleged infringing work is not a duplicate of the copyrighted work, a determination of whether protected elements have been taken requires a close analysis of the differences and similarities between the two works."

E. Kitch & H. Perlman, Legal Regulation Of The Competitive Process 665 (2d ed. 1979). This type of analysis often is necessary to reach a general, subjective conclusion regarding substantial similarity.

*Sons, Inc.*, 472 F.Supp. 481, 482 (W.D.Pa. 1979), *aff'd without op.*, 631 F.2d 725 (3d Cir. 1980); 3 Nimmer § 13.03[E], at 13–51 to –52. "It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). "Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954); *see Baker v. Selden*, 101 U.S. 99, 102–03, 25 L.Ed. 841 (1879). The Copyright Act of 1976 codifies this idea-expression dichotomy. 17 U.S.C. § 102(b); *see* H.Rep.No. 94–1476, 94th Cong., 2d Sess. 57, *reprinted in* [1976] U.S. Code Cong. & Ad.News 5659, 5670. Thus, "if the only similarity between plaintiff's and defendant's works is that of the abstract idea, there is an absence of *substantial* similarity and hence no infringement results." 3 Nimmer § 13.03[A][1], at 13–19 (original emphasis); *see Warner Brothers*, 654 F.2d at 204, 208; *Durham*, 630 F.2d at 913.

■ It follows that copyright protection does not extend to games as such. *Chamberlin v. Uris Sales Corp.*, 150 F.2d 512 (2d Cir. 1945); *see also Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 300 n.1 (9th Cir. 1979). As Professor Nimmer notes, however, "some limited copyright protection is nevertheless available in connection with games. . . . [A] relatively minimal artistic expression, if original, would render copyrightable . . . the pattern or design of game boards and playing cards as pictorial or graphic works." 1 Nimmer § 2.18[H][3], at 2–212. Recognizing this

principle, the Second Circuit has held copyrightable as an audiovisual work, *see* 17 U.S.C. § 102(a)(6), the "repetitive sequence of a substantial portion of the sights and sounds" of a video game called "SCRAMBLE."[7] *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 856 (2d Cir. 1982); *see also Atari, Inc. v. Amusement World, Inc.*, Civ. No. Y–81–803, slip op. at 9 (D.Md. Nov. 27, 1981); *Midway Mfg. Co. v. Dirkschneider*, Civ. No. 81–0–243, slip op. at 13–14 (D. Neb. July 15, 1981) (PAC–MAN). This appeal requires us to address the related question of the *scope* of copyright protection to be afforded audiovisual games such as PAC–MAN. To do so, we must first attempt to distill the protectible forms of expression in PAC–MAN from the game itself. *See, e.g., Durham*, 630 F.2d at 914–15.

■ There is no litmus paper test by which to apply the idea-expression distinction; the determination is necessarily subjective. As Judge Learned Hand said, "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc*." *Peter Pan Fabrics*, 274 F.2d at 489. Courts and commentators nevertheless have developed a few helpful approaches. In *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), Judge Hand articulated what is now known as the "abstractions test":

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. . . . [T]here is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their

---

7. But the court carefully limited its holding:
 We need not decide at what point the repeating sequence of images would form too insubstantial a portion of an entire display to warrant a copyright, nor the somewhat related issue of whether a sequence of images (*e.g.*, a spaceship shooting down an attacking plane) might contain so little in the way of

particularized form of expression as to be only an abstract idea portrayed in noncopyrightable form, *see Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).
 At 857.

expression, his property is never extended. Nobody has ever been able to fix that boundary, and nobody ever can.... As respects plays, the controversy chiefly centers upon the characters and sequence of incident, these being the substance. (citations omitted). This "test" has proven useful in analyzing dramatic works, literary works, and motion pictures, where the recurring patterns can readily be abstracted into very general themes.[8]

■ A related concept is that of idea-expression unity: where idea and expression are indistinguishable, the copyright will protect against only identical copying. *Krofft*, 562 F.2d at 1167–68. *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir. 1971), presents a good example and discussion of this limitation. Plaintiff charged defendants with copyright infringement of a pin in the shape of a bee encrusted with jewels. The court assumed the validity of plaintiff's copyright, but refused to find substantial similarity:

> What is basically at stake is the extent of the copyright owner's monopoly—from how large an area of activity did Congress intend to allow the copyright owner to exclude others? We think the production of jeweled bee pins is a larger private preserve than Congress intended to be set aside in the public market without a patent. A jeweled bee pin is therefore an "idea" that defendants were free to copy. Plaintiff seems to agree, for it disavows any claim that defendants cannot manufacture and sell jeweled bee pins and concedes that only plaintiff's particular design or "expression" of the jeweled bee pin "idea" is protected under its copyright. The difficulty, as we have noted, is that on this record the "idea" and its "expression" appear to be indistinguishable. There is no greater similarity between the pins of plaintiff and defendants than is inevitable from the use of jewel-encrusted bee forms in both.

When the "idea" and its "expression" are thus inseparable, copying the "expression" will not be barred, since protecting the "expression" in such circumstances would confer a monopoly of the "idea" upon the copyright owner free of the conditions and limitations imposed by the patent law.

*Id.* at 742; *see also Franklin Mint Corp. v. National Wildlife Act Exchange, Inc.*, 575 F.2d 62 (3d Cir.), *cert. denied*, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). "The idea and expression will coincide when the expression provides nothing new or additional over the idea." *Krofft*, 562 F.2d at 1168.

In the context of literary works, some courts have adopted a similar *scenes a faire* approach. *Scenes a faire* refers to "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Alexander v. Haley*, 460 F.Supp. 40, 45 (S.D.N.Y.1978); *see Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Such stock literary devices are not protectible by copyright. *Reyher*, 533 F.2d at 91. Thus, "similarity of expression, whether literal or nonliteral, which necessarily results from the fact that the common idea is only capable of expression in more or less stereotyped form will preclude a finding of actionable similarity." 3 Nimmer § 13.03[A][1], at 13–28. Courts have applied this concept to written game rules, *see, e.g., Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967); *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co.*, 513 F.2d 1183, 1188–89 (2d Cir. 1975); *Durham*, 630 F.2d at 914–15, and to the pictorial display of game boards, *see Atari, Inc. v. Amusement World, Inc.*, slip op. at 11–15.

■ As *Kalpakian* and other cases show, that a work is copyrighted says very little

---

**8.** One commentator offered a further refinement of this test:

> No doubt the line does lie somewhere between the author's idea and the precise form in which he wrote it down.... [P]rotection covers the 'pattern' of the work ... the sequence of events, and the development of the interplay of characters.

Chafee, *Reflections on the Law of Copyright*, 45 Colum.L.Rev. 503, 513 (1945).

about the scope of its protection. But the *Kalpakian* case is nonetheless instructive in that it represents one end of a spectrum of protection. As a work embodies more in the way of particularized expression, it moves farther away from the bee pin in *Kalpakian*, and receives broader copyright protection. At the opposite end of the spectrum lie the "strongest" works in which fairly complex or fanciful artistic expressions predominate over relatively simplistic themes and which are almost entirely products of the author's creativity rather than concomitants of those themes. *See, e.g., Krofft*, 562 F.2d at 1169 ("The expression inherent in the H. R. Pufnstuff series differs markedly from its relatively simple idea"). As one court noted: "The complexity and artistry of the expression of an idea will separate it from even the most banal idea. . . . [T]he scope of copyright protection increases with the extent expression differs from the idea." *Id.* at 1168. *See also Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904 (3d Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 42 L.Ed.2d 92 (1975) ("between the extremes of conceded creativity and independent effort amounting to no more than the trivial, the test of appropriation necessarily varies"); *Clarke*, 472 F.Supp. at 482–83.

 Plaintiffs' audiovisual work is primarily an unprotectible game, but unlike the bee pin, to at least a limited extent the particular form in which it is expressed (shapes, sizes, colors, sequences, arrangements, and sounds) provides something "new or additional over the idea." *See Goodson-Todman Enterprises, Ltd. v. Kellogg Co.*, 513 F.2d 913 (9th Cir. 1975). In applying the abstractions test, we find that plaintiffs' game can be described accurately in fairly abstract terms, much in the same way as one would articulate the rules to such a game. *Cf. Morrissey* (no infringement of written game rules). PAC–MAN is a maze-chase game in which the player

scores points by guiding a central figure through various passageways of a maze and at the same time avoiding collision with certain opponents or pursuit figures which move independently about the maze. Under certain conditions, the central figure may temporarily become empowered to chase and overtake the opponents, thereby scoring bonus points. The audio component and the concrete details of the visual presentation constitute the copyrightable expression of that game "idea."

 Certain expressive matter in the PAC–MAN work, however, should be treated as *scenes a faire* and receive protection only from virtually identical copying. The maze and scoring table are standard game devices, and the tunnel exits are nothing more than the commonly used "wrap around" concept adapted to a maze-chase game. Similarly, the use of dots provides a means by which a player's performance can be gauged and rewarded with the appropriate number of points, and by which to inform the player of his or her progress. Given their close connection with the underlying game, K. C. Munchkin's maze design, scoring table, and "dots" are sufficiently different to preclude a finding of infringement on that basis alone.

 Rather, it is the substantial appropriation of the PAC–MAN characters that requires reversal of the district court. The expression of the central figure as a "gobbler" and the pursuit figures as "ghost monsters" distinguishes PAC–MAN from conceptually similar video games. Other games, such as "Rally-X"[9] (described in *Dirkschneider*) and North American's own "Take the Money and Run,"[10] illustrate different ways in which a basic maze-chase game can be expressed. *See also Durham*, 630 F.2d at 914–15. PAC–MAN's particular artistic interpretation of the game was designed to create a certain impression which would appeal to a nonviolent player

---

**9.** In Rally-X, the object is to guide a car through a maze clearing various check-points (represented by flags) to score points and avoiding collision with a number of pursuit cars. *Dirkschneider*, slip op. at 6.

**10.** In Take the Money and Run, the player-controlled figure and the pursuit figures are presented as humanoid forms.

personality. The game as such, however, does not dictate the use of a "gobbler" and "ghost monsters." Those characters are wholly fanciful creations, without reference to the real world.[11] *See Krofft; Walt Disney Productions v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) (Cummings, J., sitting by designation), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979).

North American not only adopted the same basic characters but also portrayed them in a manner which made K. C. Munchkin appear substantially similar to PAC-MAN. The K. C. Munchkin gobbler has several blatantly similar features, including the relative size and shape of the "body," the V-shaped "mouth," its distinctive gobbling action (with appropriate sounds), and especially the way in which it disappears upon being captured. An examination of the K. C. Munchkin ghost monsters reveals even more significant visual similarities. In size, shape, and manner of movement, they are virtually identical to their PAC-MAN counterparts. K. C. Munchkin's monsters, for example, exhibit the same peculiar "eye" and "leg" movement. Both games, moreover, express the role reversal and "regeneration" process with such great similarity that an ordinary observer could conclude only that North American copied plaintiffs' PAC-MAN.

▪▪▪▪▪ Defendants point to a laundry list of specific differences—particularly the concept of moving dots, the variations in mazes, and certain changes in facial features and colors of the characters—which they contend, and the district court apparently agreed, shows lack of substantial similarity. Although numerous differences may influence the impressions of the ordinary observer, "slight differences between a protected work and an accused work will not preclude a finding of infringement" where the works are substantially similar in other respects. *Durham*, 630 F.2d at 913; *see Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.), *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Exact reproduction or near identity is not necessary to establish infringement. "[A]n infringement . . . includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy." *Universal Pictures Co., Inc. v. Harold Lloyd Corp.*, 162 F.2d 354, 360 (9th Cir. 1947). In comparing the two works, the district court focused on certain differences in detail and seemingly ignored (or at least failed to articulate) the more obvious similarities. The *sine qua non* of the ordinary observer test, however, is the overall similarities rather than the minute differences between the two works. *Peter Pan Fabrics*, 274 F.2d at 489; *cf. Warner Brothers*, 654 F.2d at 209–11 ("Judge Motley's opinion indicates that she properly focused upon 'the similarities not the differences' "). The nature of the alterations on which North American relies only tends to emphasize the extent to which it deliberately copied from the plaintiffs' work. *Concord Fabrics, Inc. v. Marcus Brothers Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir. 1969). When analyzing two works to determine whether they are substantially similar, courts should be careful not to lose sight of the forest for the trees.[12] *Hoehling*, 618 F.2d at 979–80.

---

11. With each video game, the line of demarcation between idea and expression and the extent to which certain expressions may constitute *scenes a faire* will vary. *See, e.g., Atari, Inc. v. Amusement World, Inc.*, slip op. at 13–15.

12. Many of the differences, such as North American's inability to duplicate some of the more distinctive features of PAC-MAN's monsters, may be due to the lesser capacity of the home video medium. That a work is transferred into a different medium is not itself a bar to recovery. *Universal Pictures*, 162 F.2d at 360;

2 Nimmer § 8.01[B], at 8–13. An author has the exclusive right to produce derivative works based on the original work, 17 U.S.C. § 106(2), and that right often can be more valuable than the right to the original work itself. Although dissection and expert testimony is not favored, the judicially created ordinary observer test should not deprive authors of this significant statutory grant merely because the technical requirements of a different medium *dictate* certain differences in expression. Without deciding the question, we note that in some cases it may be important to educate the trier of fact as

■ To assess the impact of certain differences, one factor to consider is the nature of the protected material and the setting in which it appears. *Universal Athletic Sales*, 511 F.2d at 908. Video games, unlike an artist's painting or even other audiovisual works, appeal to an audience that is fairly undiscriminating insofar as their concern about more subtle differences in artistic expression. The main attraction of a game such as PAC–MAN lies in the stimulation provided by the intensity of the competition. A person who is entranced by the play of the game "would be disposed to overlook" many of the minor differences in detail and "regard their aesthetic appeal as the same." *Cf. Krofft*, 562 F.2d at 1166–67 (children would view accused characters as substantially similar to the protected characters despite differences in detail).

■ The defendants and the district court order stress that K. C. Munchkin *plays* differently because of the moving dots and the variety of maze configurations from which the player can choose. The focus in a copyright infringement action, however, is on the similarities in protectible *expression*. Even to the extent that those differences alter the visual impression of K. C. Munchkin, they are insufficient to preclude a finding of infringement. "[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon*, 81 F.2d at 56. Infringement may be found where the similarity relates to matter which constitutes a substantial portion of plaintiffs' work—*i.e.*, matter which is of value to plaintiffs. 3 Nimmer § 13.03[A][2], at 13–31 to –32; *see also Universal Pictures*, 162 F.2d at 361. It is irrelevant that K. C. Munchkin has other game modes which employ various maze configurations. The only mode that concerns this court is the one that uses a display most similar to the one in PAC–MAN. Other cases similarly have separated the "attract" mode from the "play" mode in comparing two audiovisual games. *See, e.g., Dirkschneider*, slip op. at 7–9; *Stern Electronics, Inc. v. Kaufman*, 523 F.Supp. 635 (E.D.N.Y.1981) (preliminary injunction), *aff'd*, 669 F.2d 852, 857 (2d Cir. 1982). Moreover, PAC–MAN's distinctive characters alone may constitute material of substantial value. *Cf. Walt Disney; Krofft* (cartoon characters).

While not necessarily conclusive, other extrinsic evidence additionally suggests that plaintiffs are likely to succeed on their copyright claim. In promoting K. C. Munchkin, several retailers and sales clerks described that game by referring to PAC–MAN. Comments that K. C. Munchkin is "Odyssey's PAC–MAN" or "a PAC–MAN game" especially reflect that at least some lay observers view the games as similar. *Cf. Union Carbide*, 531 F.2d at 384 (trademark infringement); *MCA, Inc. v. Wilson*, 425 F.Supp. 443, 450 (S.D.N.Y.1976), *aff'd in part*, 211 U.S.P.Q. 577 (2d Cir. 1981) (spontaneous reactions of the ordinary observer are relevant). *But cf. Ideal Toy Corp. v. Kenner Products*, 443 F.Supp. 291, 303 (S.D. N.Y.1977) (disregarding statements that the accused work "looks like" the protected work). Furthermore, North American's direction to Mr. Averett that he make certain superficial changes in the gobbler figure may be viewed as an attempt to disguise an intentional appropriation of PAC–MAN's expression.

■ Based on an ocular comparison of the two works, we conclude that plaintiffs clearly showed likelihood of success.[13] Although not "virtually identical" to PAC–

to such considerations in order to preserve the author's rights under the Copyright Act. *See* 3 Nimmer § 13.03[E], at 13–45. We do not, however, propose that wholly *voluntary* changes in expression be given any less weight by the trier of fact.

**13.** We do not, however, agree with plaintiffs that PAC–MAN is entitled to broader protection simply because it is an audiovisual work.

The case plaintiffs cite for that proposition, *Universal City Studios v. Sony Corp. of America*, 659 F.2d 963 (9th Cir. 1981), in inapposite. In *Sony*, the Ninth Circuit addressed only the question of whether home video recording is *exempt* from liability for copyright infringement, not whether the test for infringement is any less exacting.

MAN, K. C. Munchkin captures the "total concept and feel" of and is substantially similar to PAC–MAN. *Accord Dirkschneider*, slip op. at 9, 10 n.6. This case is a far cry from those in which the defendant appropriated only the game idea, but adopted its own unique form of expression, *see Durham*, 630 F.2d at 914–15, or where minor variations or differences were sufficient to avoid liability because the form of expression was inextricably tied to the game itself, *see Affiliated Hospital; Atari, Inc. v. Amusement World, Inc.; Clarke; Freedman v. Grolier Enterprises, Inc.*, 179 U.S. P.Q. 476, 479 (S.D.N.Y.1973).

## IV. IRREPARABLE INJURY, BALANCE OF HARDSHIPS, PUBLIC INTEREST

▮ Irreparable injury may normally be presumed from a showing of copyright infringement. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). Even without the aid of that presumption, plaintiffs clearly have established irreparable harm. The record reveals that Midway's PAC–MAN has become an immensely popular arcade game, sales of which have exceeded $150 million after only one year. In October 1981, Atari had already committed over $1.5 million to the licensing, development, and promotion of its home video version of PAC–MAN, which it intends to put on the market in March 1982. As of the date of the hearing in the district court, Atari had booked orders for PAC–MAN in excess of one million cartridges with a sales value of over $24 million. By marketing K. C. Munchkin, North American jeopardized the substantial investments of Midway and especially Atari. The short-lived nature of video games further underscores the need for a preliminary injunction. *See Dirkschneider*, slip op. at 20; *Stern*, 523 F.Supp. at 638. Moreover, the Atari and Odyssey game cartridges are not interchangeable. To play K. C. Munchkin, the purchaser must also buy North American's ODYSSEY [2] game console. The impact of North American's infringement therefore extends even beyond the PAC–MAN game to the whole Atari system.

▮ The balance of hardships and public interest factors do not weigh against the entry of a preliminary injunction. North American's only alleged hardship is the profits it would lose if enjoined from marketing K. C. Munchkin. This argument, however, "merits little equitable consideration." *Helene Curtis Industries v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1333 (7th Cir. 1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). "Advantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed." *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934), quoted in *Helene Curtis*, 560 F.2d at 1333. This is also not a case in which the plaintiffs' harm would be *de minimis* in comparison to that of the defendants. Finally, a preliminary injunction is necessary to preserve the integrity of the copyright laws which seek to encourage individual effort and creativity by granting valuable enforceable rights. *Dirkschneider*, slip op. at 20–21; *see Mazer*, 347 U.S. at 219, 74 S.Ct. at 471. Defendants point to no competing public interest that would be harmed.

## V. CONCLUSION

The district court's conclusion that the two works are not substantially similar is clearly erroneous, and its refusal to issue a preliminary injunction constitutes an abuse of discretion. Since this is an interlocutory appeal, however, we are mindful that our holding does not constitute a conclusive adjudication of the merits of plaintiffs' claim. *See Hunter v. Atchison, T. & S. F. Railway Co.*, 188 F.2d 294, 298–99 (7th Cir.), *cert. denied*, 342 U.S. 819, 72 S.Ct. 36, 96 L.Ed. 619 (1951). The ordinary observer test should not be applied in a judicial vacuum. Further development of the facts at trial may command a different conclusion.

▮ For the foregoing reasons, we reverse the district court's denial of plaintiffs'

motion for a preliminary injunction and direct the district court to enter a preliminary injunction against continued infringement of plaintiffs' copyright.[14]

---

**14.** A preliminary injunction on the copyright claim eliminates the need to address the district court's ruling on the unfair competition claim. We do note, however, that where the defendants' work is visually similar to the plaintiffs' work, state unfair competition law may prohibit the marketing of defendants' work if it is not clearly labeled to prevent likelihood of confusion as to source. *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 238, 84 S.Ct. 779, 782, 11 L.Ed.2d 669 (1964). Moreover, while language such as "like PAC–MAN" or "as challenging as PAC–MAN" might constitute legitimate comparative advertising and not cause confusion, that assessment does not apply with equal force to phrases such as "Odyssey's PAC–MAN" or "a PAC–MAN game." *Cf. Ideal Toy,* 443 F.Supp. at 308 (defendant's toys were merely said to "look like" the "Star Wars" movie).