**ANIMAL FAIR, INC. d/b/a Carousel by Guy, Plaintiff,**

v.

**AMFESCO INDUSTRIES, INC., Defendant.**

**No. Civ. 4–85–490.**

United States District Court, D. Minnesota, Fourth Division.

Aug. 2, 1985.

MEMORANDUM

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiff's motion for a preliminary injunction. Plaintiff seeks an order enjoining the defendant from manufacturing, distributing, promoting or selling one of defendant's products, a novelty slipper resembling a bear's foot, on the ground that the defendant is violating federal copyright and unfair competition laws. The Court heard testimony and arguments on plaintiff's motion between June 26, 1985 and July 1, 1985. In view of the fact that the first shipments of defendant's slippers were scheduled to take place soon after the hearing on plaintiff's motion, the Court issued a brief Order on July 12, 1985 preliminary enjoining the defendant from any further manufacture, promotion, display, distribution or sale of its slipper or of any design confusingly similar to plaintiff's copyright- ed slipper.[1] This Memorandum details the basis of the Court's Order, and incorporates the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.

**FACTS**

This is a civil action for infringement of United States Copyright Registration VA 170–162, a copyright on a slipper resembling a bear's paw, for unfair competition under 15 U.S.C. § 1125(a) and the common law of unfair competition, and for violations of the Minnesota Deceptive Trade Practices Act, Minn.Stat. § 325D.43 *et seq.* Plaintiff Animal Fair, Inc., d/b/a Carousel By Guy (Animal Fair), is a Minnesota corporation with its principal place of business in Edina, Minnesota. Animal Fair is in the business of designing, manufacturing, and selling stuffed toys and related products, including novelty slippers. Defendant AMFESCO Industries, Inc. (Amfesco) is a New York corporation with its principal place of

Earl D. Reiland, Paul A. Welter, Janet Westrom and R. Lawrence Buckley, Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, Minn., for plaintiff.

Eugene L. Johnson, Stuart Hemphill, Dorsey & Whitney, Minneapolis, Minn., Gerard F. Dunne, Eliot Gerber, Bruce N. Proctor, Wyatt, Gerber, Shoup, Scobey & Badie, New York City, and Joseph Nurnberg, Kane, Kessler, Proujansky, Preiss & Nurnberg, New York City, for defendant.

1. The Court also preliminarily enjoined the defendant from advertising or promotion which tends to communicate that defendant or its representatives have the sole right to distribute bear's foot slippers, and from any other advertising or promotion which tends to create the impression of an affiliation or licensing relationship between Animal Fair, Inc. and defendant. In a subsequent Order dated July 19, 1985, the Court required the plaintiff to post a surety bond in the amount of $300,000 with the Clerk of Court.

business in Plainview, New York. Amfesco is in the business of designing, manufacturing, and selling men's, women's, and children's footwear, including slippers.

In March of 1984 John Hommes, Animal Fair's director of custom sales and marketing, developed a highly original artistic design for a novelty slipper. The concept was a fanciful rendition of an animal's foot, having some resemblance to a bear's foot or paw. Hommes sought to achieve a "fun-loving" and "whimsical" look in his slipper design, and intended for the slipper to be distinctively different from other novelty slippers on the market. This design objective was consistent with Animal Fair's marketing philosophy; Animal Fair is a relatively small firm which sells high quality products and which survives in the marketplace by offering distinctive and unique items. The bear's paw style slipper developed by Hommes in March of 1984 was a highly unusual item. At the time that it was first developed and marketed, there was no other product similar to Animal Fair's slipper being sold in the retail market.

During March and April of 1984, Hommes worked with a number of different prototype slippers until he settled on a final design for production. The production version of Hommes' design, Plaintiff's Exhibit 21, is a slipper stuffed with foam and fiber to give it an unusual, soft profile, with a tan sueded sole that is very broad at the toes and tapered toward the heel. The body of the slipper is covered with a brown fur-like material.[2] The slipper sculpture has relatively larger length and width dimensions at the sole than other slippers. The bottom of the slipper carries a fanciful rendition of an animal print in the ground. This print design is dark brown, in contrast to the tan color of the rest of the sole. It consists of four oval shaped, toepadlike markings toward the front of the slipper, and one larger paw print-like marking positioned in the middle of the slipper. The most unusual feature of the Animal Fair slipper are four prominent tan stuffed projections, or "toes," which extend forward and downward at the front of the slipper. The Animal Fair slipper is identified by the trademark "BEARFOOT™."

An integral portion of the BEARFOOT novelty slipper is a story about a character named "J.J. Bearfoot," which directly relates to the slipper's characteristics. Plaintiff's Exhibit 46. This story is printed on a large hangtag which is securely attached to each pair of slippers by a plastic filament which holds the pair together until the consumer has purchased them and brought them home. This hangtag carries a prominent copyright notice.

Retail buyers and consumers both responded enthusiastically to the BEARFOOT™ slipper. In late March or early April, 1984, Hommes showed his prototype design, Plaintiff's Exhibit 1, to Laurel Kanitz, a buyer for Dayton's department stores in Minneapolis. Kanitz became extremely excited about the slipper because it was the first time that she had ever seen a slipper that was made to resemble the foot of an animal. Preliminary injunction hearing transcript, at 87. When she put the slipper on and walked around the Dayton's office, the other buyers' reaction was so positive that she immediately knew that the product would be one of the store's most important items for the 1984 fall and Christmas selling season. Id. at 87–88. Kanitz subsequently ordered 1,800 pairs of the BEARFOOT™ slipper. This order, as well as the initial orders of buyers for other retailers, was somewhat conservative, because the consumer reaction to novelty items is quite unpredictable.

The BEARFOOT™ slipper was first shipped to retail outlets in August of 1984. There was a tremendous consumer reaction to the product. Department store buyers rapidly depleted their supplies of the BEARFOOT™ slipper, and sought to obtain more from Animal Fair for the 1984 Christmas season. Numerous customers wrote testimonial letters to Animal Fair expressing their enthusiasm for the unique and

---

**2.** The Animal Fair slipper is also available in white fur. *See* Plaintiff's Exhibit 45.

creative design of the slipper. Plaintiff's Exhibit 62. In the span of one selling season, the BEARFOOT™ slipper became the most successful product ever developed by designer Hommes and the most successful product in terms of sales dollars in the 23-year history of Animal Fair.

Animal Fair designed the BEARFOOT™ slipper to have two copyright notices. Given the nature of the slipper design, it is somewhat difficult to place a prominent copyright notice which is clearly visible and also durably attached to the slipper. One of the notices on the BEARFOOT™ slipper, as the Court has noted, is on the hangtag connecting each pair of slippers. The second notice, in accordance with company policy, is placed on an interior sewn-in seam label. Animal Fair inadvertently omitted the copyright notice on the sewn-in labels of a certain percentage of the first slippers which it manufactured.[3] Animal Fair first became aware of the absence of notice sometime in mid-November of 1984, when its attorney brought the problem to the attention of Animal Fair president Dean Fitch.[4] Immediate action was taken to remedy the problem. Fitch promptly called the production facility, verified that there was an absence of notice from some labels, and instructed that such notice be added. Nicholas Brandt, the vice president in charge of manufacturing, testified that he took steps in mid-November to ensure that subsequently manufactured slippers contained a notice on the seam label. Later slippers contained the copyright notice on both the seam label and the hangtags. Animal Fair did not send replacement seam labels to its retail outlets to cover those slippers which had been shipped prior to the middle of November and which did not have the copyright notice on the seam label. It is undisputed, however, that all of those slippers contained a copyright notice on the hangtag. The Court finds that under all the facts and circumstances, Animal Fair acted reasonably in remedying the lack of notice.

After the BEARFOOT™ slipper arrived on the market in August of 1984, defendant Amfesco moved swiftly to copy Animal Fair's copyrighted design. On or around August 20, 1984, an Amfesco sales representative gave Amfesco sample maker James Murphy an Animal Fair BEARFOOT™ slipper to copy. Murphy cut apart the slipper in order to determine how it was stuffed, and took measurements in order to duplicate the design. By the next day, Murphy had developed a sample slipper based on the BEARFOOT™ design, and a set of patterns for that slipper. Murphy and the other Amfesco design personnel working with him eventually made six sample slippers; some of these were sent to sales representatives to attempt to take orders for the slipper, and one pattern and slipper was sent to Amfesco's manufacturing plant in Brewer, Maine. Murphy testified that he spoke with Amfesco president David Greenblatt about the design for the bear's paw slipper.

At some point in mid-September of 1984, Greenblatt showed a bear's paw style slipper to Edmund Farace, the president of Amfesco's Apres Leisure Division; it was unclear from the evidence whether this slipper was Animal Fair's BEARFOOT™ or one of Amfesco's sample copies. Farace

---

**3.** The precise number of BEARFOOT™ slippers produced without a copyright notice on the interior seam label has not been determined. Animal Fair president Dean Fitch estimated that approximately 50,000 slippers were manufactured between August 1, 1984 and early November, 1984, the time period in question. Twenty percent of these slippers were assembled in Haiti, and all contained a notice on the seam label. The remaining 80 percent of the slippers were assembled in Eden Valley, Minnesota, where the absence of notice was detected. It is unclear how many of the slippers assembled in Minnesota lacked a copyright notice on the inner seam label.

**4.** Richard Duff, Animal Fair's vice president of sales, had some recollection of hearing of the absence of notice from the sewn-in seam label, and speculated that it probably would have been in July, 1984. This could not have been with respect to Animal Fair BEARFOOT™ slippers intended for distribution and sale to the public, however, since production did not begin until August, 1984, and distribution did not begin until late August, 1984.

testified that he did not care for the slipper when he first saw it. Farace's interest in the slipper, however, picked up considerably after he made a trip to several retail outlets later in September. On September 25, 1984, Farace saw an Animal Fair BEARFOOT™ slipper at Dayton's department store in Minneapolis, and learned that it was extremely successful. Farace called Greenblatt from Minneapolis to tell him that he was excited about the product. On September 27, 1984 Farace looked at a pair of Animal Fair slippers at Marshall Fields in Chicago. He viewed the hangtag which contains the copyright notice. Upon Farace's return to New York, he called a personal friend who was a department store buyer, and asked that an Animal Fair slipper sample be sent to him for his use. Farace met with Brenda Tillman, vice president of merchandising for Amfesco's Apres Leisure Division, in early October, and discussed plans for producing and marketing a bear's paw slipper and other animal foot style slippers. Tillman subsequently worked with Norman Roy, the production manager of Amfesco's Brewer, Maine factory, on developing the Amfesco bear's paw slipper.

In October of 1984, Amfesco began production of its bear's paw style slippers for delivery to department store customers. Roy testified that he did not utilize the patterns sent to him by Amfesco designer Murphy in designing both the prototype and production slippers which he developed. Instead, he constructed his own patterns based upon an examination of the sample copy of Animal Fair's slipper. Despite the fact that Roy constructed his own patterns, he still essentially duplicated Animal Fair's BEARFOOT™ slipper. Amfesco's 1984 production version of its bear's paw slipper (the "1984 slipper"), Plaintiff's Exhibit 18, is virtually identical to Animal Fair's BEARFOOT™ slipper. Amfesco copied the overall shape and design, the color and artwork on the sole of the slipper, and the aspect of four unrealistic stuffed cloth toes projecting from the front of the slipper, from Animal Fair's slipper. The only difference between the two slippers that is discernible upon a casual inspection is the color of the fur;[5] Amfesco's slipper is a lighter brown than Animal Fair's slipper, which has a mixture of brown and dark brown fibers. This difference, however, is negligible.

Amfesco decided at an early stage in the development of its bear's paw slipper that at the earliest possible time it would use molded plastic toes or projections on its slipper rather than the cloth covered stuffed toes of Animal Fair. The reason for this decision was that the molded toes are much less expensive to produce. At about the same time that Amfesco was manufacturing and distributing its 1984 copy of Animal Fair's slipper, it was designing a new model with molded toes, which would be included in a collection of animal slippers called IT'S A JUNGLE OUT THERE™. The slipper that Amfesco finally developed, which the parties have referred to as the "1985 slipper" (as distinguished from the "1984 slipper"), is the product which Animal Fair seeks to restrain Amfesco from manufacturing and selling.

Amfesco sold approximately 15,000 pairs of its 1984 version of the slipper during the 1984 Christmas season, and manufactured approximately another 65,000 pairs which are currently in inventory in Brewer, Maine. On December 13, 1984, Animal Fair's counsel sent a letter to Amfesco advising it of the proprietary rights which it asserted in the BEARFOOT™ slipper and demanding that Amfesco stop the sale of its "knockoff" slippers.[6] In a letter dated January 7, 1985, Amfesco's counsel advised Animal Fair that without admitting any copyright infringement or other liability, Amfesco would cease and desist from

---

**5.** The toe pads on its sole pattern are somewhat oblong, whereas the toe pads on Animal Fair's BEARFOOT™ slipper are of more rounded shape. This difference, however, is apparent only upon fairly close inspection of the two products.

**6.** A knockoff is a copy of another product's design that sells for less than the original.

any further sale or shipment of its 1984 slipper. Amfesco did stop the sale and shipment of its 1984 slipper, and plaintiff's motion for a preliminary injunction does not seek relief with respect to that product. Subsequent to Amfesco's letter of January 7, however, it did continue to utilize the 1984 slipper in a manner which was intended to confuse the marketplace and which in fact did cause such confusion. Amfesco showed its 1984 version to the public to promote sales at the January 14, 1985 New York market week and the February, 1985 shoe show, both of which draw department store buyers and others interested in purchasing slippers for resale to the public. Tillman testified that the 1984 slipper was brought to these shows in order to make it clear to buyers who had purchased the 1984 slipper that Amfesco was now marketing a new and different version of a bear's paw slipper (the "1985 slipper"). It is clear to the Court, however, that the 1984 slipper was brought to these shows in order to capitalize on the excitement that had been generated by Animal Fair's product by confusing prospective buyers.

In February of 1985, Amfesco continued its deceptive and unfair practices by running a deliberately misleading advertisement in Footwear News, a trade journal. See Plaintiff's Exhibit 11, attached to this Memorandum as Appendix A. This advertisement, which was entitled "PLEASE BEAR WITH US WHILE WE MAKE AN IMPORTANT LEGAL ANNOUNCEMENT," stated that "Amfesco Industries, Inc. has the sole right to manufacture and sell bear paw slippers and other types of animal feet slippers as copyrighted by Am-fesco Industries, Inc." Amfesco president Greenblatt also sent reprints of this ad, along with a cover letter, to many department store buyers.[7] Amfesco contends that the advertisement was not misleading, since it does have a copyright on the slipper design which it developed for the 1985 Christmas season. While an exceedingly technical reading of the language of the ad might support the view that Amfesco was merely trying to let the industry know that it would protect its copyright, the only reasonable interpretation is that Amfesco sought to convey the impression that it owned the concept of the bear's foot slipper and that it was solely able to manufacture and sell such a product.[8] A reader of the ad in question would naturally think that all other makers of bear's foot style slippers, including Animal Fair, are infringing Amfesco's copyright. Plaintiff presented credible evidence that some department store buyers did interpret the statement in the ad to mean that Amfesco owned all rights to produce and sell bear's paw style slippers. See Deposition of Katherine Ann Nysven, at 32–36; Affidavit of Lisa Jurasinski, June 25, 1985, Plaintiff's Exhibit 67; Affidavit of Diane Hauschile, June 20, 1985, Plaintiff's Exhibit 68. The Court finds that this advertisement was a deceptive and outrageous device on the part of Amfesco. The egregious nature of the advertisement is heightened by the fact that it was distributed shortly after Amfesco's response to Animal Fair's "cease and desist" letter, in which Amfesco indicated that it would stop selling its "1984 slipper."

---

**7.** This letter stated, in part:
> Please note that I have taken the liberty to enclose a recent publication which depicts Amfesco's exclusive "BEAR PAW" slipper and mentions other animal feet slippers that are the exclusive and copyrighted property of Amfesco Industries Inc.

Plaintiff's Exhibit 12.

**8.** One of Animal Fair's advertising brochures serves as an excellent example of the type of neutral language which Amfesco could have utilized if it had simply been interested in letting the trade know that it intended to protect its copyright. This brochure contained pictures of several different Animal Fair slipper products. The back of the brochure contained the following statement:

> COPYRIGHT NOTICE. It is the policy of Carousel by guy™ to protect its creative designs by all legal means, including copyrights and patents. We solicit trade cooperation in the avoidance of infringement. Carousel by guy™ will take action against infringers to protect its interests. All rights are reserved under the Universal Copyright Convention and the Pan American Union.

Plaintiff's Exhibit 54.

Amfesco's development of its "1985 slipper," the product that is the focus of the present motion for preliminary injunctive relief, must be viewed in the context of the foregoing discussion. From the very outset, Amfesco set out to copy Animal Fair's creative design and to interfere with Animal Fair's proprietary rights. Amfesco's "1984 slipper" was a brazen "knockoff" that was identical in every material respect to Animal Fair's BEARFOOT™ slipper. Amfesco's "1985 slipper," although slightly different from its initial "knockoff" product, is still essentially a copy of the BEARFOOT™ slipper. Amfesco attempted to prove to the Court that its 1985 slipper was the result of independent creative efforts on the part of its designers, that Amfesco attempted to make the slipper "as different as possible" from the BEARFOOT™ product, and that the two slippers are not substantially similar products. The evidence presented to the Court clearly demonstrated that Amfesco's positions are without support.

Amfesco's 1985 slipper, Plaintiff's Exhibit 20, was designed primarily by Norman Roy and Brenda Tillman, during the fall of 1984 and the first few months of 1985. Amfesco claims that this product was the culmination of independent creation on its part. Tillman testified that after she became aware of Animal Fair's claim of infringement with respect to the 1984 slipper, she tried to make the slipper "as different as possible" from the BEARFOOT™. The Court cannot accept these claims. Tillman admitted that she made interchangeable reference to the 1984 Amfesco slipper and to Animal Fair's slipper throughout the design of the 1985 version of Amfesco's slipper. Moreover, in a February 4, 1985 memorandum to Roy, with copies to Farace and Greenblatt, Tillman stated that she needed to take a sample of the slipper "... to the attorney to assure we are going to have enough difference...." Plaintiff's Exhibit 40. The Court finds that Tillman and Roy merely "fine tuned" the 1984 slipper for the 1985 line by adding molded plastic toes and by making some minor changes in detail. Amfesco's 1985 slipper is substantially similar to Animal Fair's BEARFOOT™ design. Amfesco incorporated numerous aspects of the artistic design it copied from Animal Fair's slipper in 1984. These included the sculptural aspect of being stuffed, the same approximate height profile, the same profile when viewed from the top, the same unusual sole shape, the same number of unrealistic tan toes or projections, the texturing of the molded toes to make them appear "fuzzy" like the brushed nylon cloth toes of the Animal Fair slipper, a similar placement and presence of a dark colored animal print on the sole of the slipper, and a similar combination of fabric textures and colors.

While Animal Fair's and Amfesco's slippers both purport to be a representation of a bear's paw, neither slipper accurately reflects the actual appearance of a bear's paw. Moreover, both slippers differ from an actual bear's paw in the same respects. This is significant because it highlights the extent to which Amfesco copied Animal Fair's unique design features. David Garshelis, a wildlife zoologist and expert on bear anatomy, testified in great detail regarding the ways in which the slippers differed from actual bear's paws. First, the fur on both pairs of slippers is shorter, less coarse, and more fuzzy and fluffy than real bear's fur; the fur on each slipper also sticks up randomly rather than falling in one direction toward the toes as it would on a real bear. Second, the bottoms of the slippers are both unrealistic in that a real bear's paw would have fur or hair covering all the tan portions of the slippers. Third, the toe prints on the bottoms of each slipper are not properly spaced from each other or positioned on the sole. Further, on a real bear there would be five rather than four toepads. Finally,[9] a real bear has five distinct, separate fur covered toes, with claws projecting from those toes. The four

---

**9.** The Court does not mean to suggest that this is a complete and exhaustive description of the many ways in which the two slippers differ from a real bear's paw. Garshelis enumerated a number of other discrepancies.

projections which are attached to the front of the slippers of both parties do not resemble in any manner either the toes or claws of a real bear. These projections are perhaps the most outstanding feature of Animal Fair's creative design. The comparison of both slippers to a real bear's paw clearly reveals that Amfesco copied Animal Fair's toe design, as well as a number of other features.

In an attempt to downplay the unique character of the BEARFOOT™ design, Amfesco argues that both slippers are similar in many ways to the "mop" slipper, a conventional item in the trade which AMFESCO has manufactured for years. *See* Defendant's Exhibits Z–30 to Z–32. It is clear from the testimony, however, that neither Amfesco nor Animal Fair made reference to conventional mop slippers in developing their respective designs. Moreover, the shape, profile, fabric, sole shape, projections, and artwork on the sole of the BEARFOOT™ slipper are all significantly different from the conventional mop slipper design. The Court therefore concludes that no significant portion of the design which Animal Fair seeks to protect, and which Amfesco copied in both its 1984 and 1985 slippers, comes from a conventional mop slipper.

There are some minor differences between the 1985 Amfesco slipper and the BEARFOOT™ design. Amfesco chose a somewhat darker brown fur,[10] and it added a logo or trademark on the sole of its slippers designed for the department store trade, at approximately the same position as the large dark paw print on the BEARFOOT™ slipper.[11] These differences are negligible. The difference upon which Amfesco places the most emphasis is the toe, or claw, which it developed for its 1985 slipper. These toes are molded plastic, and have a black tip which somewhat resembles a nail. As the Court has already noted, the primary motivation for the development of

the plastic toe was cost. Roy and Tillman developed several prototype toes before they settled on the final production version. This version was chosen in part because it was textured in order to make it look "fuzzy" like the brushed nylon cloth toes on Animal Fair's BEARFOOT™ slipper. While the toes of the two slippers are slightly different in appearance, they are placed in a similar position on each slipper, and give the same overall impression to the casual observer.

In short, Amfesco's 1985 bear's paw slipper is substantially copied from Animal Fair's copyrighted BEARFOOT™ slipper. Animal Fair presented credible evidence to the Court that department store buyers have recognized that the Amfesco slipper is a copy of Animal Fair's design; Amfesco failed to produce any department store buyer to testify that its slipper was not a copy of the BEARFOOT™ slipper. The Court finds that both retail buyers and consumers would be confused as to the origin of the Amfesco slipper, given the similarities in design and Amfesco's actions in marketing the item.

The presence of Amfesco's confusingly similar slippers in the marketplace poses a serious threat to Animal Fair. The market for a novelty item such as the bear's paw style slipper generally lasts for a maximum of two years. Items such as these are considered fads, for which consumer demand peaks quickly and then rapidly diminishes. Accordingly, the upcoming 1985 Christmas season is the last major retail opportunity with respect to Animal Fair's slippers. As a result of Amfesco offering its 1985 version copying aspects of Animal Fair's BEARFOOT™ slipper, department store buyers have become confused. Purchase order documents of Amfesco indicate that buyers are purchasing Amfesco's slippers by referring to Animal Fair's BEARFOOT™ trademark. Plaintiff's Exhibit 87.

---

**10.** Amfesco, like Animal Fair, also manufactures a bear's foot slipper with white fur. Defendant's Exhibit Z–2.

**11.** Amfesco did not add this logo to those of its slippers designed for sale in discount retail stores. On these slippers, it removed the large paw print, leaving only the four toe prints which it borrowed from Animal Fair's slipper.

This is a clear indication that the two slippers have become confused in buyers' minds. Plaintiff has also offered credible evidence that some buyers are uncertain as to whether Animal Fair or Amfesco owns the rights to Animal Fair's design. *See, e.g.,* Testimony of Dean Fitch, Transcript at 466; Affidavit of Lisa Jurasinski, Plaintiff's Exhibit 67; Affidavit of Diane Hauschile, Plaintiff's Exhibit 68.[12] This confusion obviously poses a threat of harm to Animal Fair.

The competition from Amfesco's slipper has also resulted in a chaotic marketplace. Animal Fair president Dean Fitch testified that a number of buyers have delayed their orders and that others have purchased the BEARFOOT™ slipper at reduced levels due to the presence of copies in the market. Transcript at 467. *See also* Affidavit of Gerry Curatola, Plaintiff's Exhibit 64. Other buyers have split their orders between the slippers despite recognition of Amfesco's lower quality, to protect themselves in the event of the market being flooded with lower quality slippers from Amfesco which consumers may not distinguish from Animal Fair's higher quality slipper. Deposition of Katherine Ann Nysven, at 29–32.

Because of the similarities between the slippers, and differences between the quality of the parties' slippers, Animal Fair's reputation for quality and its practice of offering a unique design to the marketplace are both in jeopardy. Moreover, the confusing similarity between the products will clearly result in lost sales for Animal Fair. Animal Fair's vice president of sales testified that the company has cut its production by several hundred thousand pairs. Transcript at 66. Finally, if the present situation of the chaotic market is allowed to persist without protection to Animal Fair, it will be essentially impossible to determine at a later time what Animal Fair's sales would have been but for the

presence of Amfesco's copied design in the marketplace.

The Court was shocked at the evidence presented by Amfesco, as well as the manner in which it was presented. There was an almost total lack of candor on the part of Amfesco's witnesses. The officers and employees of Amfesco who testified on its behalf at the preliminary injunction hearing were argumentative and evasive in answering clear, straightforward questions. The witnesses gave deliberately vague answers time and time again, even after the Court's admonishment. Finally, testimony of Amfesco's witnesses contradicted each other on key points and was inconsistent with statements previously made in the witnesses' own sworn affidavits. The Court is convinced from all the testimony and evidence that Amfesco failed to conduct itself in good faith either in the development of its bear's paw slipper or in the presentation of its case in this lawsuit.

## DISCUSSION

Plaintiff has moved the Court for an order enjoining the defendant from manufacturing, displaying, promoting, selling, and distributing its 1984 and 1985 copies of plaintiff's copyrighted BEARFOOT™ slipper during the pendency of this action, and enjoining the defendant from advertising in such a manner as to create the impression of an affiliation between the plaintiff and the defendant. The test for whether preliminary injunctive relief should issue is set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir.1981). Four factors are to be considered:

(1) the probability that movant will succeed on the merits;

(2) the threat of irreparable harm to the movant;

(3) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; and

(4) the public interest.

---

12. The Court has the discretion on a motion for preliminary injunction to consider affidavits as well as live testimony, given the necessity of a prompt decision. *See, e.g. Bracco v. Lackner,*

462 F.Supp. 436, 442 (N.D.Cal.1978). The Court has admitted the affidavits of buyers into evidence in the present case solely as proof of the buyers' state of mind.

*Dataphase,* 640 F.2d at 114. There are two basic grounds for plaintiff's motion. First, plaintiff contends that the defendant has infringed its valid copyright on the BEARFOOT™ slipper. Second, plaintiff argues that the defendant has engaged in unfair competition, in violation of the Lanham Trademark Act, 15 U.S.C. § 1125(a). While the Court has determined that plaintiff has demonstrated a likelihood of success on both grounds,[13] the primary basis for the Court's decision to grant plaintiff's motion for a preliminary injunction is the claim of copyright infringement.

**1. Likelihood of Success on the Merits**

**A. *Copyright***

■ In order to establish a claim of copyright infringement, a plaintiff must prove its ownership of a valid copyright, and copying, or infringement, of the copyrighted work by the defendant. *Atari, Inc. v. North American Phillips Consumer Electronics Corp.,* 672 F.2d 607, 614 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); 3 *Nimmer on Copyright,* § 13.01. Plaintiff has introduced into evidence Certificate of U.S. Copyright Registration No. VA–170–162, dated December 17, 1984, issued to Animal Fair. This registration is prima facie evidence of the validity of the copyright and the facts stated in the certificate, including ownership. 17 U.S.C. § 410(c); *Novelty Textile Mills v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 n. 1 (2d Cir.1977). Defendant has not contested the ownership of the copyright, but has attacked the validity of

the copyright on the ground that plaintiff's notice of copyright was inadequate pursuant to 17 U.S.C. §§ 401 *et seq.*

**(1) Copyright notice**

■ The requirements for copyright notice are set forth at 17 U.S.C. § 401:

(a) **General requirement.**—Whenever a work protected under this title is published in the United States or elsewhere by authority of the copyright owner, a notice of copyright as provided by this section shall be placed on all publicly distributed copies from which the work can be visually perceived, either directly or with the aid of a machine or device.

. . . .

(c) **Position of Notice.**—The notice shall be affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright. The Register of Copyrights shall prescribe by regulation, as examples, specific methods of affixation and positions of the notice on various types of works that will satisfy this requirement, but these specifications shall not be considered exhaustive.

Defendant attacks the adequacy of plaintiff's copyright notice on two grounds: first, that the hangtags which have always been attached to the BEARFOOT™ slippers by plaintiff, and which have always included a copyright notice, nevertheless provide insufficient notice under the statute,[14] and second, that the inner seam tag for some of the first produced BEARFOOT slippers did not originally include a copy-

---

**13.** The plaintiff has also asserted a claim under the Minnesota Deceptive Trade Practices Act, Minn.Stat. § 325D.43 *et seq.* In light of the Court's holding that the plaintiff has demonstrated a substantial likelihood of success on the merits of its copyright and unfair competition claims, so as to justify the issuance of a preliminary injunction, the Court will not reach this state law claim.

**14.** Defendant's argument is based on 37 C.F.R. § 202.2(b)(9), which provides that copyright notice on detachable tags does not meet the requirements of proper notice for a work published before January 1, 1978. This regulation derived from cases which held that the require-

ment in the Copyright Act of 1909 that the notice be "affixed" to the work mandated a permanently attached notice. *E.g., Gardenia Flowers, Inc. v. Joseph Markovits, Inc.,* 280 F.Supp. 776, 783 (S.D.N.Y.1968). The 1976 Copyright Act apparently liberalized this requirement by providing that "the notice shall be affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright." 17 U.S.C. § 401. Plaintiff contends that 37 C.F.R. § 202.2(b)(9) is inapplicable to this case because its slipper was published after January 1, 1978. Plaintiff further argues that the copyright notice on the hangtag satisfies the requirements of 17 U.S.C. § 401(c).

right notice, and that plaintiff failed to adequately correct this omission. The Court has determined that notwithstanding the fact that some of plaintiff's slippers were distributed without a copyright notice on the seam label inside the slipper, plaintiff's copyright is valid under the notice savings provision of the Copyright Act. 17 U.S.C. § 405. Accordingly, the Court will not reach the question of whether the copyright notice on the hangtag between the pair of slippers was affixed in such a manner and location as to give "reasonable notice" of the claim of copyright.[15] 17 U.S.C. § 401.

■ Publication of copies of a work with a defective notice of copyright does not necessarily impair a creator's copyright protection. Section 405 of the Copyright Act provides, in part:

(a) **Effect of Omission on Copyright.** —The omission of a copyright notice prescribed by sections 401 through 403 from copies or phonorecords publicly distributed by authority of the copyright owner does not invalidate the copyright in a work if—

.    .    .    .    .

(2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public in the United States after the omission has been discovered....

17 U.S.C. § 405(a)(2). In the instant case, registration was made within five years after the first proven publication.[16] In accordance with company policy, plaintiff routinely placed a copyright notice on a sewn-in seam label in the interior of its slipper. A certain percentage of the early slippers produced by plaintiff, however, inadvertently omitted the copyright notice

from this label. Plaintiff first became aware of this omission in mid-November, 1984. Plaintiff's president immediately called the production facility to verify the absence of the notice from the labels and to instruct the production personnel to add such a notice. Steps were promptly taken to place the copyright notice on the seam label, and later slippers contained such a notice. The Court therefore finds that the plaintiff made "reasonable effort" to add the copyright notice to its slippers, so as to cure the original omission of notice under section 405(a)(2).

While the defendant is not barred from raising the technical defense of copyright notice, the Court is mindful of the following facts in weighing the equities involved in the present motion and in preliminarily determining the sufficiency of plaintiff's copyright notice and cure efforts. First, the defendant never looked for a copyright notice, either on the hangtag or the seam label. Second, the defendant boldly manufactured and marketed its 1985 copies of plaintiff's copyrighted work even after it was notified by plaintiff of the existence of its copyright, in December of 1984. Finally, the defendant was not misled in any way by the alleged lack of notice. *See American Greetings Corp. v. Kleinfab Corp.*, 400 F.Supp. 228, 234 (S.D.N.Y.1975). The Court therefore rejects defendant's notice defense, and finds that plaintiff has a valid copyright in its BEARFOOT™ slipper.

### (2) Scope of copyright protection

■ A threshold question in any copyright case is what characteristics of the plaintiff's design are entitled to copyright protection. *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498 (2d Cir.1982). The protection afforded a copyrighted work

---

**15.** The Court would simply note that there is no doubt in this case that the copyright notice on the hangtag was prominent to anyone purchasing or inspecting the product, and that defendant's vice president Edmund Farace admitted viewing the hangtag when he first saw the BEARFOOT™ slipper.

**16.** The date of first publication of the BEARFOOT™ slipper was June 12, 1984, and the effective date of the copyright registration was December 17, 1984.

covers only the work's particular expression of an idea, and not the idea itself. *Mazer v. Stein*, 347 U.S. 201, 217–18, 74 S.Ct. 460, 470–71, 98 L.Ed. 630 (1954); 17 U.S.C. § 102(b) (copyright protection does not extend "to any idea ... concept [or] principle ... regardless of the form in which it is described, explained, illustrated, or embodied ..."). The defendant contends that plaintiff's position is therefore overly broad, since it would prohibit anyone from marketing any slipper that resembled a bear's foot. The copyright laws, according to defendant, protect only the artistic expression actually embodied in Animal Fair's particular bear's foot slipper. Plaintiff's theory in this lawsuit, however, is not as broad as the defendant contends. Plaintiff does not argue that it owns the concept of a bear's paw type slipper. Indeed, neither plaintiff's slipper nor defendant's slipper are realistic representations of a bear's paw. The plaintiff seeks only to protect what may be properly copyrighted under the law: the particular artistic expression embodied in its novelty slipper.

A second threshold issue relating to the scope of copyright protection is whether and to what extent the plaintiff's slippers are "useful articles" so as to be excluded from coverage under the Copyright Act. Under the Act, a "useful" article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. The design of a useful article is protectible under the copyright laws "only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Id.* Defendant attempts to limit the scope of plaintiff's copyright by arguing that the BEARFOOT™ slipper is a useful article which cannot as a

whole be the subject of a copyright. Defendant contends that the only artwork of the BEARFOOT™ slipper that can be identified separately from the slipper itself are the four toes extending from the forward portion of the slipper and the artwork on the sole of the slipper, and that the Court may examine only these features in determining whether defendant has infringed any copyright of plaintiff.

■ The Court will assume for purposes of the present motion that plaintiff's slipper is a useful article within 17 U.S.C. § 101.[17] Notwithstanding this assumption, defendant's characterization of the scope of copyright protection in this case is far too narrow. Virtually all of the design aspects of plaintiff's slipper "can be identified separately from, and ... exist ... independently of, the utilitarian aspects of the [slipper]." 17 U.S.C. § 101. It is clear that such features need not be physically separable from the useful article in order to be protectable; it is enough that they can be conceptually separated. *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 993 (2d Cir.1980). In the present case, plaintiff's design features are conceptually separate from the utilitarian aspects of its slipper. Plaintiff correctly notes that one could draw a line drawing of the whole shape and design which would be recognizable as a fanciful artistic rendition of a bear's paw, regardless of what type of functional or utilitarian object it was used to adorn. *See Ted Arnold Ltd. v. Silvercraft Co.*, 259 F.Supp. 733 (S.D.N.Y.1966) (pencil sharpener with exterior shape in form of antique telephone held protectable); *Royalty Designs, Inc. v. Thrifticheck Service Corp.*, 204 F.Supp. 702 (S.D.N.Y. 1962) (toy banks in shape of dogs held protectable). The impractical width and shape of the BEARFOOT™ sole, the art-

---

**17.** Plaintiff makes a strong argument that the BEARFOOT™ slipper is not a useful article within the statutory definition. The slipper is a novelty item which is primarily intended for personal adornment. The story on the hangtag, as well as the impractical aspects of the design as a piece of footwear, suggest that the essential quality of the slipper is its unique appearance rather than its use as a functional piece of clothing. The Court need not resolve this issue, however, since it is clear that plaintiff's design is fully entitled to copyright protection even if it is assumed to be a useful article.

work on the sole, the particular combination of colors, the profile of the slipper, the stuffed aspect of the slipper, and the toes are all sculptural features which comprise the artistic design and which are wholly unrelated to function. The Court therefore finds that the entire exterior design of plaintiff's slipper is protectable under the Copyright Act.

### (3) Infringement

■ The critical issue in plaintiff's copyright claim is whether defendant copied, or infringed, plaintiff's copyrighted work. The issue of infringement is divided into two sub-issues: whether the defendant had access to plaintiff's copyrighted work and whether the copyrighted and allegedly infringing work are "substantially similar." *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498 (2d Cir.1982). In the present case, the evidence clearly demonstrated that the defendant used plaintiff's copyrighted BEARFOOT™ slipper as a model when it designed its slipper. The infringement issue is therefore confined to the question of whether the two slippers are "substantially similar."

■ The "substantial similarity" requirement "presents one of the most difficult questions in copyright law, and one which is the least susceptible of helpful generalizations." 3 *Nimmer on Copyright*, § 13.-03[A]. The Eighth Circuit, in *Wihtol v. Crow*, 309 F.2d 777 (1962), adopted the following test:

> The test of infringement is whether the work is recognizable by an ordinary observer as having been taken from the copyrighted source. Slight differences and variations will not serve as a defense.

*Id.* at 780, *quoting Bradbury v. Columbia Broadcasting System, Inc.*, 287 F.2d 478 (9th Cir.1961). Stated slightly differently, if enough "material of substance and value" has been taken so that an ordinary observer would recognize that there is

"borrowing" from the original, the two items are "substantially similar." *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). Plaintiff correctly points out that under the above test, since similarities rather than differences are considered, the presence of differences does not negate infringement. *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 n. 4 (2d Cir. 1977). This test does not contemplate a detailed dissection of the two works, but rather hinges on whether the accused work has captured the "total concept and feel" of the copyrighted work. *Atari, Inc.*, 672 F.2d at 614; *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970).

The Court finds that the defendant's 1985 bear's paw style slipper is substantially similar to plaintiff's BEARFOOT™ slipper. The Court has already made detailed factual findings on the similarities between the two slippers, and need not repeat that discussion here, except to note that the similarity is between the artistic or expressive aspects of the slipper design rather than simply the concept of a bear's paw type slipper. In short, it is clear to the Court that the defendant copied a number of key design aspects of plaintiff's slipper, and that the two slippers very closely resemble each other. Moreover, the ordinary observer would certainly recognize that defendant's slipper was taken from plaintiff's slipper. *Wihtol v. Crow*. There are admittedly some differences between the two slippers, the most prominent being the black tip on the end of the toes on defendant's product. These minor differences, however, are insufficient to defeat plaintiff's claim of infringement. *Novelty Textile Mills*, 558 F.2d at 1093 n. 4. They clearly do not alter the fact that defendant has captured the "total concept and feel" of plaintiff's unique BEARFOOT™ slipper. *Roth*, 429 F.2d at 1110.[18]

---

**18.** Defendant also argues that certain features of both slippers are similar to aspects of the de-

signs of conventional "mop slippers" and other designs. Design aspects of another work are

Based on the foregoing discussion, the Court finds that the plaintiff has demonstrated a substantial likelihood that it will succeed on the merits of its copyright claim at trial. Accordingly, the plaintiff has established the first prong of the four part test for the issuance of preliminary injunctive relief set forth in *Dataphase*.

### B. Unfair competition

Plaintiff alleges that defendant is engaging in unfair competition by violating 15 U.S.C. § 1125(a), which provides in part as follows:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The elements of a cause of action for unfair competition under 15 U.S.C. § 1125(a) are outlined in *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1217 (8th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976):

> 1. The copied features must be non-functional;
>
> 2. The non-functional features must have secondary meaning, that is, they must tend to be looked to as an indication of source or origin of the goods; and
>
> 3. There must be a likelihood of confusion among prospective purchasers as to source.

The Eighth Circuit in *Fruehauf* set forth the following test for functionality:

> [W]here the features are "functional" there is normally no right to relief. "Functional" in this sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial suc-

cess of the product, the interests in free competition permits its limitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made.

536 F.2d at 1217, *quoting Bliss v. Gotham Industries, Inc.*, 316 F.2d 848, 855 (9th Cir.1963) (citations omitted).

Plaintiff argues that the features comprising the design of its slipper are arbitrary and have nothing to do with the product's usefulness. Rather, plaintiff contends that its design serves to identify and individualize its product, and therefore sets it apart from others in the marketplace. Basic consumer demand for slippers, according to the plaintiff, centers on features such as fit, durability, cost, and machine washability. Plaintiff therefore argues that the BEARFOOT™ design is non-functional and entitled to trademark protection.

Defendant argues that it is the unusual appearance of the bear's foot slipper that generates consumer demand, and that the bear's foot design is therefore functional. Defendant places considerable reliance on the Ninth Circuit's decision in *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952). In *Pagliero*, a manufacturer and distributor of hotel china brought an unfair competition action based upon alleged copying of its designs. The court rejected the plaintiff's claim on the ground that the designs on the china were non-protected functional features, noting that "[o]ne of the essential selling features of hotel china, if, indeed, not the primary, is the design[,] ... [and that] [t]he attractiveness and eye-appeal of the design sells the china." *Id.* at 343.

relevant, however, only if plaintiff or defendant copied from the work. *Dollcraft Industries, Ltd. v. Well-Made Toy Mfg.*, 479 F.Supp. 1105, 1111

(E.D.N.Y.1978). Neither fact has been established in this case.

Defendant's argument is not without merit. The Court has determined, however, that the design features of plaintiff's BEARFOOT™ slipper are non-functional. The decision in *Pagliero* should be interpreted narrowly in order to avoid creating disincentives for the development of creative and attractive designs. *Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822, 825 (3d Cir.1981). The Ninth Circuit itself has retreated somewhat from its broad holding in *Pagliero*. In *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769 (1981), the Ninth Circuit expressly noted that a product feature could not be viewed as functional simply because it contributes to consumer appeal and salability of the product. *Id.* at 773. In the present case, the unique design of plaintiff's product is primarily related to identification and individuality, rather than to the utilitarian function of the product. Plaintiff has therefore satisfied the first element of the unfair competition cause of action under section 1125(a).

The second element of the unfair competition cause of action is that the non-functional features must have "secondary meaning." The Eighth Circuit set forth the following description of "secondary meaning" in *Fruehauf*:

"[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods * * * may become so associated in the public mind with such goods * * * that it serves to identify them and distinguish them from the goods * * * of others. When such an association exists, the name, mark, or symbol is said to have acquired a 'secondary meaning,' in which the original user has a property right which equity will protect against unfair appropriation by a competitor." * * * "A trade-mark or a trade name may have acquired a secondary meaning in one locality but lack such a meaning in another."

536 F.2d at 1219, *quoting Shoppers Fair of Arkansas, Inc. v. Sanders Co.*, 328 F.2d 496, 499 (8th Cir.1964).

■ Defendant argues that plaintiff has failed to demonstrate secondary meaning, since plaintiff entered the slipper market with its bear's foot slipper only recently and is therefore not a company with a long and exclusive use of the product. Proof of secondary meaning, however, is unnecessary where a product's exterior dress is inherently distinctive. *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981) *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982); *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 952–54 (2d Cir.1980); *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). *See also* 1 J. McCarthy, *Trademarks and Unfair Competition*, § 7:31 at 263 (2d ed. 1984) (U.S. Patent and Trademark Office permits registration of inherently distinctive product shapes on the Principal Register without any further showing of secondary meaning). In the instant case, the unique design of plaintiff's BEARFOOT™ slipper certainly qualifies as inherently distinctive exterior dress, so that plaintiff need not demonstrate secondary meaning.

■ Even if plaintiff was required to demonstrate secondary meaning, however, the facts in this case are sufficient to establish this element. An inference of secondary meaning arises when a defendant copies a plaintiff's design. *Fruehauf*, 536 F.2d at 1220 n. 13. Such an inference is clearly present in this case, since the defendant brazenly copied key features of plaintiff's slipper design. The presence of secondary meaning is further evidenced by buyers' comments or questions regarding affiliation between the parties and by defendant's advertisement misleadingly claiming rights in the bear paw slipper design. The Court therefore finds that the plaintiff has established the element of secondary meaning.

■ The final element in the section 1125(a) unfair competition cause of action is the likelihood of confusion among prospective purchasers as to source or origin. The plaintiff need not demonstrate actual confusion. *Squirtco v. Seven-Up Co.*, 628

F.2d 1086, 1091 (8th Cir.1980). In the present case, there is clearly a likelihood of confusion between the two bear's foot slippers. The substantial similarity which plaintiff demonstrated in order to prevail on its copyright claim is the primary factor which leads to this conclusion. A second supporting factor is the fact that consumers purchasing the slippers in question will likely do so on impulse rather than after "careful and deliberate examination of the products." *See Application of E.I. duPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A.1973). Finally, likelihood of confusion can be inferred where the defendant has intended to trade upon the plaintiff's reputation. *Fruehauf*, 536 F.2d at 1220. The evidence in the instant case, in particular the defendant's direct copying of plaintiff's product, its grossly misleading advertisement, and its use of its "1984 slipper" at trade shows after it had been advised of plaintiff's copyright, strongly suggests an intent to trade on plaintiff's reputation. Plaintiff has therefore established the third and final element of the cause of action for unfair competition under 15 U.S.C. § 1125(a). Accordingly, the Court finds that the plaintiff has demonstrated a substantial likelihood that it will succeed on the merits of its unfair competition claim at trial.

### 2. Irreparable Harm

■ The general rule in copyright infringement cases is that irreparable injury is presumed for the purposes of a preliminary injunction motion once the moving party has established a case of copyright infringement. *Northwestern Bell Tel. Co. v. Bedco of Minn., Inc.*, 501 F.Supp. 299, 303 (D.Minn.1980); *Metro-Goldwyn-Mayer v. Showcase Atlanta Co-op Prod.*, 479 F.Supp. 351, 362 (N.D.Ga.1979). The plaintiff has demonstrated a substantial likelihood of success on its copyright claim, and has therefore also established the irreparable harm prong of the *Dataphase* test.

The Court notes that even if there were no such presumption of irreparable harm, the evidence in the present case would support such a finding. In the absence of an injunction, the defendant would continue to flood the market with its inferior quality, infringing products. This would cause the plaintiff both lost profits and lost reputation. It would be exceedingly difficult, if not impossible, to assess the damage to plaintiff at a later time if the defendant were not restrained. Moreover, the short retail life of novelty items such as the BEARFOOT™ slipper heightens the need for a preliminary injunction in this case. *See Atari, Inc. v. North American Philips Consumer Elec. Corp.*, 672 F.2d 607, 620 (7th Cir.) *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). The plaintiff has therefore demonstrated a clear threat of irreparable harm.

### 3. Balance of Harms

■ The balance of harms does not militate against the issuance of a preliminary injunction. The only harm which the defendant will suffer is the lost profits on its infringing slippers. This is not a weighty equitable consideration. *Atari, Inc.*, 672 F.2d at 620. A willful infringer which seeks to profit by copying from others' creative ideas should not be heard to complain that its interests will be disturbed by an injunction. *See Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). Moreover, the potential harm to the plaintiff in terms of lost profit and reputation is considerable, and quite likely outweighs any harm which the defendant might suffer. The Court therefore concludes that the balance of harms favors the issuance of a preliminary injunction.

### 4. Public Interest

The copyright laws are designed to "... encourage individual effort and creativity by granting valuable enforceable rights." *Atari, Inc.*, 672 F.2d at 620; *see Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). The granting of a preliminary injunction would help to promote the above goal and would therefore

serve the public interest. The defendant argues that the public has an interest in competition. The public's interest, however, is in *fair* competition, and not the unlawful and unfair competition engaged in by the defendant.

**CONCLUSION**

The plaintiff has demonstrated a substantial likelihood of success on the merits of its copyright and unfair competition claims. Plaintiff has further established the equitable prerequisites for in-junctive relief set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981). A preliminary injunction restraining the defendant from manufacturing, promoting, displaying, distributing, or selling its 1984 or 1985 copies of plaintiff's copyrighted BEARFOOT™ slipper, or any other design confusingly similar with the BEARFOOT™ slipper, is therefore warranted in the present case.

This Memorandum accompanies and is made a part of the Court's Orders of July 12, 1985, and July 19, 1985.

APPENDIX A

# PLEASE BEAR WITH US WHILE WE MAKE AN IMPORTANT LEGAL ANNOUNCEMENT

**FIRST THE LEGAL FACTS:**

Amfesco Industries, Inc. has the sole right to manufacture and sell bear paw slippers and other types of animal feet slippers as copyrighted by Amfesco Industries, Inc.

The design of these slippers is protected under the copyright laws of the United States and the Universal Copyright Convention and are proprietary to Amfesco Industries, Inc. All rights reserved.

**NOW THE FUN FACTS:**

This collection of animal feet slippers is wild and wonderful. There are leopard paws, zebra feet, sheep hooves and a lot more; all created to bring retailers a lot of plus business for Fall/Holiday '85.

AMFESCO Amfesco Industries, Inc. 2 Amfesco Drive, Plainview, New York 11803

©Amfesco Industries, Inc. 1985

FOOTWEAR NEWS, MONDAY, FEBRUARY 11, 1985